# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 6, 2011 Session

## STATE OF TENNESSEE v. AMEALE HUDSON

**Direct Appeal from the Circuit Court for Madison County**
**No. 10-152       Roger A. Page, Judge**

**No. W2010-02625-CCA-R3-CD  - Filed September 14, 2012**

A Madison County Circuit Court Jury found the appellant, Ameale Hudson, guilty of first degree felony murder and especially aggravated robbery. The trial court imposed an effective sentence of life imprisonment in the Tennessee Department of Correction. On appeal, the appellant contends that the trial court erred by (1) denying his motion for a change of venue; (2) denying his motion to bar the State from referring to him by his nickname,"Pistol"; and (3) denying his motion to prohibit the admission of postmortem photographs of the victim. The appellant also contends that the evidence is insufficient to support his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Joseph Taggart, Jackson, Tennessee, for the appellant, Ameale Hudson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's charges stemmed from the death of the victim, Troy Mitchell. At trial, Johnnie McKinnie, a maintenance man who worked at Guardian Courts Apartments, testified that he was at the complex on the morning of October 28, 2009. McKinnie's coworker,

Darryl Wayne Kizer, was having car trouble, and McKinnie attached a chain from his truck to Kizer's car to pull it up the hill of the apartment complex. At the top of the hill, the men saw the victim, who was a locksmith and the owner of Mitchell's Lock and Safe, working on a yellow Chevrolet Cavalier that was parked outside apartment 220, the appellant's apartment, which was located on the bottom floor. The victim's van was parked "catty cornered" to the building. McKinnie asked the victim to move his van for a moment so McKinnie could tow Kizer's car beyond it. The victim complied then went back to work on the yellow car.

While McKinnie and Kizer were removing the chain from Kizer's car, the appellant, whom McKinnie knew as "Pistol," came outside and "started . . . cussing and rushing people[] away." McKinnie heard the appellant say, "Hurry up. Let's get the H-E-L-L out of here. These folks got to go to school." McKinnie said that the appellant was six to ten feet away from the victim and that he was "scoping" the victim, repeatedly glancing at him. McKinnie saw the appellant make hand signals to communicate with two men, one of whom was Justin Gray. The men were standing at the appellant's open, bedroom window and watching the appellant. McKinnie thought the appellant "was up to something," but he and Kizer left before anything happened. Later, McKinnie identified the appellant and Gray from a photograph line-up.

Kizer testified consistently with McKinnie, noting that when the appellant tried to make them leave, he pushed and shook Kizer's car even though it was not blocking any vehicle.

Montrez McAlister testified that around 9:45 or 10:00 a.m. the morning of the shooting, he went to apartment 220 where he saw the appellant, whom he knew as "Pistol"; Gray; and another man he referred to as "Dude." "Dude" was later identified as Cornelius Roberson. The appellant's fourteen- or fifteen-year-old sister, Calvinette, was asleep on the living room couch. McAlister assumed that the appellant's mother was next door with her boyfriend. McAlister recalled that the victim's locksmith van and a yellow car were in front of the appellant's bedroom window. He identified the window from a photograph.

McAlister testified that when he walked into the apartment, Gray was putting a navy blue bandana with designs on it around his face, covering his mouth and nose. McAlister stated that the blue bandana depicted in Exhibit 19, which was a photograph, looked like the one Gray wore at the time of the shooting. Gray was dressed in a black jacket turned inside-out, a black hoodie with the hood pulled over his head, black pants, and black "Air Force 1 low top" tennis shoes. McAlister said that the appellant handed Gray a black .22 or .25 caliber "six shooter" revolver and told Gray that "[o]h, when he get through handling their business, just put it [the gun] back and we're going to take all this stuff off when you get

done." McAlister said that he did not know to what "business" the appellant was referring.

McAlister said Gray left the apartment with the gun in his pocket. McAlister went to the back of the apartment and asked Roberson what was going on, and Roberson responded, "I guess Justin [Gray is] fixing to do something stupid." McAlister heard a loud noise and looked out of the appellant's bedroom window. He saw Gray "coming up out of the [yellow] car like he – in a pulling motion, like he were pulling something out." Afterward, Gray ran around the building and returned to the appellant's apartment. The appellant opened the door, and Gray threw the revolver and bandana in the apartment. Then, Gray and the appellant walked toward Hollywood Drive. McAlister said he left the appellant's apartment because he thought that Gray had stolen a CD player from the car.

McAlister conceded that his first statement to police on November 4, 2009, in which he stated that he heard the shot while standing outside, was false. He explained that he was not truthful because he was afraid that if he admitted being in the apartment, he would be charged with a crime. Later that same day, McAlister gave a second statement to police in which he acknowledged that he was in the appellant's bedroom at the time of the shooting. McAlister said that he had a clear view of events from the window. Additionally, McAlister identified Gray from a photograph line-up. McAlister acknowledged that his nickname was "Money."

Darlene Echols testified that at the time of the shooting, she lived in apartment 130 of Guardian Courts Apartments. That morning, she saw a man, whom she later identified from a photograph line-up as "Justin [Gray]," and the appellant, whom she knew as Pistol, "running from Guardian Courts Apartments, running on Hollywood to the blue house." She said that as they ran, the men looked behind them toward the appellant's apartment. She noticed them because "[i]t's unusual for people to run through the projects." A few minutes later, Echols heard an ambulance and the police arrive. She walked toward the commotion and learned that a man had been shot. Shortly thereafter, she went back to her apartment. She saw the appellant's girlfriend pull into a driveway, the appellant quickly got into the car, and the car "zoomed off." Gray did not get into the car, and Echols did not see where he went.

Echols stated that she knew the appellant and his family "from the neighborhood." She said that young boys in the neighborhood "mostly hang around" and that when the appellant "got out of jail he sort of someway claimed the younger boys to his house, you know. He hang around with the older boys, he hung around with the younger boys." She stated that she stopped her sixteen-year-old son from associating with the appellant, explaining, "They always hang around with him. Too tough, you know. . . . I just didn't like him." She said that she did not want her son "hanging around that spot" because "there's a lot of drugs and stuff like that being – dealing around in that area."

-3-

Jasmine Carlson, the appellant's girlfriend, testified that the appellant spent the night of October 27 with her, and, on her way to college the next morning, she drove the appellant to apartment 220 in her silver Pontiac Grand Am. She picked the appellant up later in the day but could not recall the exact time or location. She did not believe that she picked the appellant up from anyone's driveway. Carlson stated that the appellant and Gray were "buddies," that they were frequently together, and that the appellant called Gray "his little brother." On cross-examination, Carlson said that she did not see the appellant with a gun on the night of October 27. She stated that the next day, she picked the appellant up after she attended chapel at Lane University, maintaining that "[c]hapel is over at about twelve, twelve-thirty."

Jackson Police Officer Ted Maxwell testified that on the morning of October 28, 2009, he was dispatched to 1170 Hollywood Drive, the location of the Guardian Courts Apartments complex, following a report of a possible shooting. When Officer Maxwell arrived, he saw some people gathered around a yellow Chevrolet Cavalier. The driver's side door of the car was open, and the victim was sitting on the ground with his back against the car. The victim's face was bleeding, he was awake, but he was not coherent. An ambulance arrived, and some of the blood was removed from the victim's face, revealing "a possible bullet entry" at the bridge of the victim's nose. The victim was taken from the scene, and photographs of the scene were taken by a crime scene officer. Officer Maxwell testified that the victim's vehicle, which was a van and trailer for Mitchell's Lock and Safe, was parked at an angle to the driver's side of the Cavalier. Inside the Cavalier, Officer Mitchell saw blood on papers and tools that were in the passenger seat. On cross-examination, Officer Maxwell stated that he was the first officer on the scene and that he did not see the appellant there.

Lieutenant Mike Turner, a crime scene investigator and property custodian for the Jackson Police Department, testified that when he arrived at the scene, the victim had been transported to the hospital. Lieutenant Turner saw a yellow Chevrolet Cavalier with the door open. The victim's van and trailer were parked at an angle, adjacent to the Cavalier. Lieutenant Turner took photographs of the scene. He stated that there was a considerable amount of blood inside the vehicle, including on the running board beside the driver's seat and on the victim's tools that were in the passenger seat. Lieutenant Turner said that he saw blood on the parking lot outside the driver's side of the vehicle.

Jackson Police Investigator Chris Chestnut testified that on October 28, 2009, he responded to a report that a man had been shot at Guardian Courts Apartments. Upon his arrival, Investigator Chestnut saw "several police officers already on the scene, an ambulance, a vehicle belonging to a locksmith, and a yellow car that had some blood on the ground beside it." As the victim was loaded into the ambulance, Investigator Chestnut took

photographs of him. After the ambulance left, Investigator Chestnut photographed the scene then went to the hospital. While at the hospital, Investigator Chestnut saw that the victim had a single gunshot wound that appeared to be from a small caliber bullet. The bullet had entered the left side of the victim's nose.

When the victim was taken for a CAT scan, Investigator Chestnut spoke with the victim's family. During the conversation, Investigator Chestnut learned that the victim's black leather wallet and Samsung cellular telephone were missing. Thereafter, he returned to the scene to assist with the search of the area.

As Investigator Chestnut and Sergeant Mike Doran were searching the apartment complex, a maintenance man, Mr. Patterson, asked the officers what they were doing. After being informed of the reasons for the officers' presence, Mr. Patterson told Investigator Chestnut that earlier that day, he had locked some vacant apartments "that were standing open," one of which was apartment 210. Patterson unlocked the apartments for Investigator Chestnut and Sergeant Doran to search. During the search, Sergeant Doran alerted Investigator Chestnut that he had found a black Samsung telephone in a drawer under the bathroom sink in apartment 210. In a cabinet underneath the drawer, Investigator Chestnut found digital scales, small Ziploc bags, and rubber gloves, which he described as drug paraphernalia. Later, the victim's son, Larry Joe Mitchell, confirmed that the telephone belonged to the victim.

Mike Doran, a sergeant with the Madison County Sheriff's Department assigned to the Metro Narcotics Unit, testified that on the afternoon of October 29, 2009, he was called to the scene to assist in searching the apartment complex. He stated that "several other investigators [from] the Narcotics Unit, the Gang Unit, and the Jackson Police Department Violent Crimes Unit" were also involved in the search. Sergeant Doran said that he and Investigator Chris Chestnut entered apartment 210, which was vacant. In a bathroom drawer, Sergeant Doran found a black Samsung telephone. Sergeant Doran informed Investigator Chestnut of his discovery.

Officers William Roane and Aimee Oxley testified that they retrieved fingerprints from apartment 210 and that none of the prints retrieved matched Gray or the appellant.

Dr. Laura Boos testified that she worked in the Tennessee Bureau of Investigation's (TBI) crime laboratory and that she tested the victim's cellular telephone and a blue coat for skin cells. On the cellular telephone, Dr. Boos found a mix of genetic material from at least two people, with the victim being the major contributor. The appellant, McAlister, and Roberson were excluded as the minor contributor, but Gray could not be excluded. On the blue coat, Dr. Boos also found a mix of genetic material from two people, with the victim

again being the major contributor. McAlister and Roberson were excluded as the minor contributor to the mixture found on the blue coat, but Gray and the appellant could not be excluded.

Investigator Terry Buckley testified that on the day of the shooting, the appellant was developed as a suspect and was brought to the police station for an interview. After being informed of his <u>Miranda</u> rights, the appellant waived his rights and agreed to speak with police. The appellant initially told Investigator Buckley that he had spent the previous evening with his girlfriend, Jasmine Carlson, and that she had driven him to his mother's apartment the next morning. He spoke briefly with "a dude" and went inside. He played music for five to ten minutes, walked to Brookfield, then returned home. Thereafter, the appellant went back to Brookfield; on the way, he saw people "hovering" around a car, then police and an ambulance arrived. The appellant left and "hung out" for a while before returning to Guardian Courts Apartments where he was apprehended by police. The appellant maintained, "I didn't have anything to do with Dude getting robbed or shot and I don't know anything about it or who did it."

On November 4, 2009, Investigator Tyreece Miller, the head of the Jackson Police Department's Violent Crimes Unit, brought the appellant in for a second interview. During the first part of the interview, the appellant acknowledged that he had been in apartment 210 where the victim's cellular telephone was found, maintaining that on October 9 or 10 a girl gave him oral sex in that apartment. The appellant also said that his fingerprints would be on scales and plastic bags that were in a bathroom cabinet in apartment 210 because he put those items there. Investigator Miller said that the cabinet where the drug paraphernalia was found was located directly under the drawer where the victim's cellular telephone was discovered.

The interview was suspended for a break, and, when it resumed, the appellant said that he had spent the night of October 27 with Carlson. The next morning, Carlson drove to class at Lane University, taking her cousin, Robin, with her. On the way to school, Carlson took him to apartment 220 where his mother lived. The appellant said that Calvinette, Gray, Roberson, and a man he knew as "Money" were in the apartment. The appellant, Gray, and Roberson went in the appellant's bedroom then went outside for a few minutes. The appellant walked to Brookfield and returned to apartment 220 approximately ten to fifteen minutes later. The appellant saw "Money," which was McAlister's nickname, outside; Gray and Roberson were in the appellant's bedroom. The appellant saw the victim driving around "looking for the car" before he began working on a yellow car. The appellant and McAlister went back to Brookfield. Gray and Roberson stayed in the appellant's bedroom.

When the appellant and McAlister returned, the victim was working inside the car.

-6-

The appellant and McAlister went in the apartment, and Gray and Roberson called the appellant over to the window. The appellant said, "My bedroom window overlooks the parking lot and you can look out my bedroom window and see the locksmith." Gray said, "'Let's rob him.'" The appellant replied, "'No.'" Gray and Roberson asked "'[w]hat we going to do?'" The appellant responded, "'I ain't doing shit,'" and Roberson agreed with the appellant. The appellant said that Gray "got up the nerve to go rob him" and went outside. The appellant, McAlister, and Roberson followed Gray outside. After the appellant smoked a cigarette, the four men went back to the appellant's bedroom. Gray said, "I'm fixing to go – I'm fixing to do it," and the four men went back outside. Gray "ran up on" the victim, pointed the gun at him, and took the victim's wallet. The appellant stated that "the gun went off. Everybody went their separate ways," with the appellant going back to Brookfield alone.

Investigator Miller testified that around 5:30 p.m., they took a break and got food from Burger King for the appellant and resumed at 7:45 p.m. Investigator Miller said that "during the time that we started back," the appellant gave information about McAlister's whereabouts. Investigator Miller had other officers locate McAlister and bring him in for an interview. During the interview, McAlister implicated the appellant in the crime. Investigator Miller explained, "[T]hat was the reason for the last interview that we did."

In his final version of events, the appellant said:

> "When I first got home that morning, [Gray, Roberson, and McAlister] were inside my apartment. There was a gun laying on my bed. The gun was a black revolver. I handed [Gray] the gun and told him to get this away from me because I'm on ten years paper[, meaning on probation].
>
> "I left and went to Brookfield and came back. [Gray, Roberson, and McAlister] stayed there. When I came back [Gray and Roberson] called me to the window. [McAlister] was just in the room. He really didn't say anything.
>
> "[Gray and Roberson were] talking about robbing the locksmith that was working on the yellow car. I went out – I went inside the house. I told [Gray], 'If you going to rob him, then rob him. You got the gun. I ain't got shit to do with this.'
>
> "Everybody went outside. [Gray] shot and robbed him. We went back inside my apartment. [Gray] had on his solid black hoody coat. He had something covering his face. [Gray]

had the locksmith's wallet and phone. That's when we all left and went our separate ways.

"I got out of jail back on October the 8th. I got a revolver on October 9th because I was being threatened. I kept the gun sometimes and [Gray] kept the gun sometimes. This was the same gun that was used in this robbery."

Lieutenant Christopher Wiser, the supervisor of the Gang Enforcement Team, testified that he was involved in the homicide investigation and that he was one of a team of officers who executed a search warrant at Gray's residence at 1221 Hollywood Drive. After they entered the residence, found it unoccupied, and secured the scene, they broke "into two-man search teams per room." Lieutenant Wiser and Sergeant Charles Wayne Mathis searched Gray's bedroom. On a shelf, Lieutenant Wiser found a school progress report bearing Gray's name and some trophies. Also in the bedroom, the officers found two blue bandanas; one was a darker blue and the other was a lighter blue. A photograph of the darker blue bandana was entered into evidence as Exhibit 19. Sergeant Mathis stated that the dark bandana was found lying on top of a pair of black jeans. Sergeant Mathis found a letter addressed to Gray from the State Department of Safety and, in Gray's nightstand, he found a "live .22 bullet." Lieutenant Wiser said that he was present when Gray was arrested at Jackson-Central Merry High School. Lieutenant Wiser acknowledged that he was not aware of any evidence found at Gray's home that could be linked to the appellant.

Danielle Jones, a violent crimes investigator with the Jackson Police Department, testified that she went to the Juvenile Detention Center and picked up shoes belonging to Gray. She identified a photograph of the shoes, which depicted a pair of black, Nike "Air Force" low-top tennis shoes.

Investigator Buckley was recalled to the stand and testified that while the appellant was in jail, he had a telephone conversation with his father. Investigator Buckley said that the recording of the conversation reflected that the appellant's father asked, "'Did they find a gun yet?'" The appellant responded, "'They got a gun but it ain't [the] gun that was committed in this robbery and this murder.'" The appellant's father inquired, "'Well, then, you ain't – Where the gun at that you supposed to have gave the boy?'" The appellant replied, "'I don't know.'"

Dr. Feng Li, the medical examiner who performed an autopsy on the victim's body, stated that the manner of the victim's death was homicide and that the cause of death was a gunshot wound to the bridge of the victim's nose. Dr. Li stated that the victim's eyes were blackened and that the bullet penetrated the cranial cavity, causing several injuries to the

brain tissues. From powder tattooing to the victim's skin, Dr. Li deduced that the shot was fired from two-and-a-half to three feet from the victim. Dr. Li retrieved two small bullet fragments from the victim's head. Because of the size of the fragments, Dr. Li believed that the bullet was a small caliber. However, the murder weapon was never recovered.

In the appellant's defense, his mother, Dorothy Hudson, testified that her father nicknamed the appellant "Pistol" when she was pregnant and that the appellant had always been called "Pistol." She said that she lived in apartment 220 but that on the morning of October 28, 2009, she was next door in her boyfriend's apartment. Around 8:00 a.m., she took her dog outside and saw the appellant walking toward the apartments from Brookfield. When she finished walking her dogs, the appellant was sitting on the porch of apartment 220. Ms. Hudson testified that she did not hear a gunshot but that she later learned someone had been shot.

The jury found the appellant guilty of felony murder and especially aggravated robbery. The trial court sentenced the appellant to life imprisonment for his felony murder conviction and imposed a concurrent sentence of twenty-five years for the especially aggravated robbery conviction.

## II. Analysis

### A. Denial of Motions

In his first three issues, the appellant challenges the trial court's denial of his motion for change of venue, the denial of his motion to bar the State from referring to the appellant as "Pistol," and the denial of his motion to prohibit the admission of postmortem photographs of the victim. The State contends that the appellant waived these issues by failing to raise them in his motion for new trial. We agree with the State.

Rule 3 of the Rules of Appellate Procedure expressly cautions that

> no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e). In other words, the failure to raise an issue of error, other than

sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review. See id. Therefore, the appellant has waived his first three appellate issues.

## B. Sufficiency of the Evidence

The appellant argues that the evidence was insufficient to sustain his convictions, arguing that the testimonies of McKinnie and Kiser were "conflicting [and] speculative" and therefore should not have been believed by the jury. The appellant also contends that although he gave Gray the gun, his statement to Gray that he "ain't got shit to do with this" showed that the appellant did not intend to promote or assist in the commission of the offenses.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

The proof at trial revealed that Gray took property from the victim and shot him in the head, causing his death. The appellant was indicted based upon his criminal responsibility for Gray's actions. In Tennessee, "criminal responsibility is not a separate, distinct crime.

-10-

It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." Id. at 171. The appellant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Specifically, when the appellant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the appellant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997).

Reviewing the evidence in the light most favorable to the State, the proof revealed that shortly before the victim's robbery and murder, Gray and the appellant were in the appellant's bedroom, and Gray began planning the robbery of the victim. Gray covered the lower half of his face with a navy blue bandana. The appellant handed Gray a revolver and told Gray that "when he get through handling their business, just put it [the gun] back and we're going to take all this stuff off when you get done." Immediately prior to the offenses, the appellant went outside to try to clear the area of witnesses, watched the victim, and communicated with Gray via hand signals. Gray shot the victim and removed something from the yellow car. The victim's family later told police that the victim's wallet and cellular telephone were missing. After taking items from the car, Gray returned to the appellant's apartment, the appellant opened the door, and Gray tossed the bandana and gun inside. Gray and the appellant ran from the apartment, looking back toward the scene of the shooting as they ran. Shortly thereafter, the appellant's girlfriend arrived in a gray car; the appellant jumped in the car, and the car quickly sped away. Police later found the victim's cellular telephone in a vacant apartment located not far from the appellant's apartment. The appellant acknowledged that he had been in the apartment and had left drug paraphernalia there. Police found the appellant's drug paraphernalia in a cabinet under the bathroom sink. In a drawer located immediately above the cabinet, police found the victim's cellular telephone. The appellant also acknowledged that he knew Gray was going to rob the victim and that the gun

-11-

Gray used in the robbery belonged to the appellant. The jury heard the evidence and, as was their prerogative, chose to accredit the evidence presented by the State; we will not now reconsider their assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). Moreover, although the appellant argues that his informing Gray that he "ain't got shit to do with this" indicates that he did not intend to promote or assist the commission of the offenses, the jury obviously discredited this argument. A jury may believe part of a defendant's statement to be truth while rejecting other parts as falsehood. See State v. Gilbert, 612 S.W.2d 188, 190 (Tenn. Crim. App.1980); Batey v. State, 527 S.W.2d 148, 150 (Tenn. Crim. App. 1975); State v. Crystal Miranda Kirby, No. E2008-01862-CCA-R3-CD, 2010 WL 1854137, at *11 (Tenn. Crim. App. at Knoxville, May 7, 2010), perm. to appeal denied, (Tenn. 2010). We conclude that the proof presented at trial amply supports the appellant's convictions of felony murder and especially aggravated robbery.

### III. Conclusion

In sum, we conclude that the appellant waived his first three appellate issues and that the State adduced sufficient proof to sustain the appellant's convictions. Therefore, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE